Number 221382 Jeffrey Israelitt versus Enterprise Services. Mr. Zaslow, take your time there when you're ready. Good to have you with us. Thank you, Your Honor. Good to be here and good morning and may it please the court. Ken Levy Zaslow on behalf of the Court of Appeals. Today's briefings are frankly straightforward matters of statutory interpretation on our first issue. Mr. Israelitt suffers from a disability in his right toe, significant mobility issues, he has issues walking, significant pain, at times he can barely walk, severely painful, and partial loss of use of the foot at times, even difficulty bathing himself. Most significantly, difficulty driving, particularly downtown driving was a significant issue for him. The briefing is very extensive on the underlying facts, but I think it's critical to jump into whether or not compensatory damages and a jury demand are appropriate under an ADA retaliation case. Just weeks before trial, after a jury trial had been scheduled for almost a year, the defense moved to strike the jury demand. The basis for striking the jury demand rises and falls with a seventh service decision, a claim of revocation, and a conviction. The Kramer case, it's not just the Seventh Circuit, right? The Ninth Circuit follows the same view, the Third Circuit follows the same view, and our court in two unpublished cases that my good friend Judge King was on also follows the same view. I mean, I understand you want to make it about one court, but in fact, it's every Court of Appeals to ever address the question, including our own, have found that it's not just the Seventh Circuit. Compensatory damages are not available. What I would say is every single one of those courts that have decided the issue rises and falls with Kramer. As if they didn't make independent judgments about what the right answer was? I'm not sure I follow that, right? It seems like to me each of those decisions stands on its own. It may rely to some greater or lesser degree on a prior precedent, but each of those decisions in the Ninth Circuit, the Third Circuit, and at least two in the Fourth Circuit. Two of them in 2004, a couple of months apart. He probably actually remembers them. I had to look them up. Yes, and Your Honor, the analysis in 2004 was compensatory damage in a jury trial unavailable, see Kramer. That was the analysis that the court engaged in. That's why the analysis in Kramer is really where you find the crux of both the Seventh Circuit and the Ninth Circuit analysis all arises out of Kramer. And what Kramer said was suppose a statutory silence displays that there are no compensatory damages and jury demand available. What Kramer and the courts that followed it have left out is that a number of pieces. Number one, remedial statutes must have given a broad interpretation to the broadest extent appropriate for the remedy. And it also has to be read in the context of the structure and the provisions. And there is a direct textual link between the statutes providing for compensatory damages and jury demand in an ADA retaliation claim. The ADA clearly permits retaliation as section 42 U.S.C. 12203A. There is no remedies within the retaliation provision of the ADA itself. So in subsection C of 12-203C, it refers back to the rights and remedies that the remedies shall be those available under section 12-117, shall be those in 12-117. 12-117 specifically says remedies shall be the powers in section 2000E-5. Section 42 U.S.C., section 1981 specifically provides compensatory and punitive damages by extension of jury demand under 12-117. So there is a direct statutory link providing that if there is a jury demand, there are compensatory damages available. But wait, but E-5 says that in addition to the remedies authorized, you may get back pay, right? But the remedies authorized by 1981A include compensatory and punitive damages, but only for two classes of cases. And so you just want to read that out to suggest that it applies to all classes of cases. What I'm suggesting is what section 1981A provided is that compensatory damages are available under section 2000E-5. Those shall be the remedies provided under the ADA retaliation. That's directly in the statute. That's directly in 12-117, which is that those shall be the remedies. So if those are the remedies within 2000E-5, those shall be the remedies. With E-5, the remedy that's actually available under E-5 is back pay, right? So the remedies authorized by 1981A, but the remedies authorized by 1981A are only for two classes of cases, not for retaliation cases, right? And so you just want to say, oh, since we're like four levels into the nesting doll, we should read out that exclusion. And so instead it should say under E-5, compensatory and punitive damages are available, period. But it doesn't say that. What I'll say, Your Honor, is that Your Honor said that it is not an exclusion, Your Honor. In fact, section 1981A actually has two exclusions, and it excludes disparate impact. It excludes good faith efforts. It actually has a list of exclusions. Congress did not exclude the ADA retaliation claims, which, again, move along with those same remedies in 2000E-5. So Congress declined to exclude it. So my question is, if 2000E-5 moves, does the ADA retaliation move along with it? It's essentially there is no remedy for A. A follows B. C moves B. Where does A move? A must move along with B. It has to be because that's a direct statutory link, and that's what the cases that have viewed it have indicated. In fact, this court has said that the Title VII remedies are applicable to ADA retaliation claims. The D.C. Circuit has likewise said that the Title VII retaliation claims are indistinguishable from those in Title VII. So it wouldn't make sense for Congress to say, well, go back and look at each step in the chain of where it's connected. Once the one moves, the other one moves along with it. And particularly given that both the ADA and Title VII are remedial statutes, and this court, again, has on numerous occasions indicated they're really indistinguishable, but because they're broad remedial statutes, they must be read for an expansive remedy. And once there is this textual link in there, it is appropriate to read the remedies along with it, because, again, once B moves, A must move along with it. What are we supposed to do with these earlier decisions? Just say they're wrong? Well, this is the time for the court to engage in that statutory analysis. Those are pre-2007 opinions. They're unreported procurement opinions. What happened in 2007? Why is 2007 relevant? 2004 is when our decision was made. But what happened in 2007? Was there, like, a statute passed? I know there's this ADAA. Is that what happened? It may change the situation. But it's when they changed the federal rules of procedure to allow citation to unpublished opinions. So, again, these are pre-2007 opinions where they really weren't even citable at that time. So, again, I think you go look at it. So it's not the ADAA. You don't think it's something about the statute. You think it's like the rules of appellate procedure? I just think when they're pre-2007… They used to be you couldn't cite them. Couldn't even cite the opinions. And now they're considered for whatever weight they're entitled to. The court deems it appropriate. They're not entitled to any weight. And I would say… That's what you say. I would say that they're opinions of this court, and they are deserving of respect and consideration. And this court went back to Cramer and to Cramer's statutory silence provisions. So, and again, I would say, well, is it actually silent? And when we can look where the statutory links are, when one moves, the other moves along with it. But your argument is it is silent, but for your argument about how they move together. So you concede that it is silent. It does not specifically state it, but because of how you have connected them together, you're saying that's how that issue is addressed. So the ADAA retaliation things are always silent on the remedies because there is no remedy within the ADAA retaliation provisions itself. So it always has to be connected to something else. It's always connected to the Title VII provisions. Yeah, but you just had a discussion with Judge Richardson where you at least acknowledged that back pay is a remedy. And it is specifically identified in the statute. Back pay is identified in the 2014 U.S.C. Section 2000-E5. It's specifically located within that statutory. So there is a remedy specifically identified in the statute. What you're saying is because it's not the remedy that you're seeking isn't, we should then follow this analysis of A is following B in order to get to it. But what I'm simply asking you is you acknowledge that it is in fact not listed. It is silent. It's not listed in the ADAA, but what 12.117 says is that it shall be the powers, remedies, and procedures within 2000-E5. Section 1981-A specifically. Well, 12.117 is not limited to E5, right? It's got other provisions too. Our case happens to focus on E5, right? And E5 tells us that you can get back pay in addition to the remedies that are authorized by 1981-A. But that only authorizes compensatory damages for two classes of cases. I mean, I don't understand how you can read authorized by 1981-A as saying more than authorized by 1981-A. I mean, it's like adding words to authorize because the language of 1981-A does not authorize compensatory or punitive damages for retaliation. But it does. It modifies 2000-E5. It modifies 2000-E5. No, no, no, but E5 says in addition to the remedies authorized by 1981-A. So we have to then turn and say what is authorized by 1981-A? And we go to 1981-A and it says compensatory and punitive damages for these two classes of cases, right? And so it's back to the question of does that authorize compensatory damages for a third class of cases? And that's retaliation cases. And I would say. But the word is authorized, right? I mean, the question is does that authorize compensatory damages? Like authorize is like an affirmative thing. And so it's not just silence. It's a lack of authorization. What I would say is that section 1982-A modifies 2000-E5 and section 12111-7. It actually modifies that statute. You have to read section 1982-A into 2000-E5, which is exactly what that does. And that was the purpose of what it provided. I'm sorry, say that again. So you think. So you agree that E5 doesn't get you there, but 12117 modifies E5? Help me understand that argument. Is that what you just said? It's the link from 12203, which is the prohibition against retaliation, providing the remedy shall be in 12117. 12117 provides the remedy shall be what is located within 2000-E5. Okay, but you said that modifies E5. I heard you just say that modifies E5. And what I'm trying to understand is how does that change the language authorized by 1981-A? That's the rub, right? Because the language authorized, if it says that, I think you've got a problem. I think you're trying to say that 12117 modifies that language, but that's what I'm having trouble understanding. It's section 1981-A that modifies 2000-E5 that modifies the remedies that are available within 2000-E5 that expands that statute. Are you taking some of the EEOC's time now? Oh, sorry. Yeah, I'm asking that. Go ahead and finish your thought and answer his question. Just to conclude that point is that once section 1982-A modifies 2000-E5, that necessarily must modify 12117, which necessarily must modify 12203. It's a direct link when you go one to the next, and that's exactly what the Edwards court said. That's exactly what the Baker court said. That's what the case of all said, that once you modify this link, you modify each one in the chain because it's not excluded. There are specific exclusions in there. This was not excluded within section 1981, and as indicated in the briefing, there were good reasons to exclude other pieces. And there's good reasons why, as we laid out in the briefing, as the EEOC laid out in the briefing, why they did not need to include the – why they would not want to specifically reference the ADA given the unintended consequences it would have. Obviously, additional three issues, but I'd like to provide my time to the EEOC. That's my fault. I gave too much time to these lawyers in that first case, and they watched me, and they took advantage of me. I'm not going to punish the EEOC over it. Good to have you here, Mr. Driscoll McEachin. Very close. It's Driscoll McEachin, Your Honor. McEachin. All right. Pleasure to be here. May it please the court. Good to have you with us, sir. Thank you. We addressed three legal issues in our brief, the definition of disability, the adverse action standard for retaliation, and this damages issue for what damages are available for employment-based retaliation claims under the ADA. I'll start with damages since that's what the panel has been discussing. Just to take a step back to state, the statutory path begins with the retaliation provision, where Congress chose not to provide separate damages for retaliation claims, but instead equate those damages to the damages available for employment discrimination claims. That's discrimination claims under Title I of the ADA. Congress then expanded those damages, as you discussed, in 1981A, where it added compensatory and punitive damages and a right to a jury trial for claims of intentional discrimination under the ADA. The reference is to 12112 and 12112B5. 12112 is the substantive discrimination prohibition section for the employment provision of the ADA. We can discuss what 12112B5 does, but really what Congress said is that intentional discrimination under the ADA is eligible for compensative and punitive damages. The way that it's structured, the retaliation and discrimination provisions, links those two together, which makes sense given the incredibly close ties between prohibitions on retaliation and prohibitions on discrimination. The ADA's retaliation provision, after all, says that no person shall discriminate on the basis of protected activity listed in the statute. The Supreme Court, in Jackson, Gomez-Perez, and many other cases, has said that retaliation is a form of intentional discrimination. Intentional discrimination in the workplace is exactly what Congress targeted with Section 1981A. We cited the statutory notes in our brief that discuss the importance and the findings and the purpose for providing damages for intentional discrimination in the workplace. Because that express link already existed between employment-based retaliation claims and employment discrimination claims in the ADA, there was not need for an additional reference to retaliation in Section 1981A. So help me understand what the word authorized means then, right? So like, I think I follow you to this point, right? But when I read E5 and it says what, you know, I'm looking at two things, back pay, right? And so back pay applies, right? Because there's no limit to back pay for this purpose in E5. But the other category is what is authorized by 1981A. And so I have to look at what is authorized by 1981A. And if 1981A was also without limitation, just like back pay, if it just said compensatory and punitive damages are available, great, we're done, right? It works. But when I read what's authorized by 1981A, I read those words and that requires authorization and it lacks authorization for retaliation claims. What am I missing there? Well, Your Honor, what I'd say is, so 1981A.A.2 provides that claims brought under 12.117, the powers and remedies provision for the employment discrimination section of the ADA, those compensatory and punitive damages are available. And I'll say again that that's expressly what Congress linked the damages for employment-based retaliation claims to. I take Your Honor's point that you're addressing the fact that it then went on to say violations of the Rehabilitation Act and the ADA's employment provision. And that's where we think that express link matters because we would not read that language in isolation. When Congress says for violations of section 12.112, it said, okay, these are the damages available for violations of that section. And it is elsewhere said that employment-based retaliation claims receive the damages that are given to employment discrimination claims under the ADA. One reason we can look at that is significant about the difference between retaliation and the employment discrimination claim explicitly referenced in 1981.88 is the retaliation provision stretches much more broadly than employment cases. It also involves retaliation involving public accommodations and public services. So if Congress had expressly referred to the 12.203, the retaliation provision, it would have expanded damages for other kinds of discrimination as well that don't involve employment. But 1981.88 is focused on employment discrimination. And providing those damages for employment-based retaliation claims accomplishes exactly that purpose. I see my time is almost out, so I just want to say briefly, Appellee acknowledges that the District Court relied on an outdated definition of disability from our pre-ADAAA regulations. Congress rejected that definition of the ADAAA, and our current regulation makes clear that an impairment need not significantly restrict a major life activity. But that's the standard that the District Court applied. I want to talk to you about material adverse too, but before, can you just help me understand, what is the difference between substantially limit and severely restrict? I mean, those seem like, I mean, I get we cut things rather thin around here, but like, those seem like awfully, like, you know, the same thing. I appreciate that, Your Honor. I think what is important in constraining those two terms is the history of the application of that significantly or severely restrict standard. In the Supreme Court's case in Toyota, and if I may continue. Please. That that was a highly restrictive standard. So when Congress passed the ADAAA, it did it expressly. I understand that they wanted to get rid of the prior cases, but we typically do that by like changing the standard, right? And not just being like, yeah, you guys do it differently this time, right? I mean, this is like the same words, but they want us to say something different. I just have a hard time understanding, like, realistically how a lawyer or a judge or a juror would look at those words and think there's anything different between them. I appreciate that, Your Honor. So Congress expressed instruction, right, was the standards lower. Our regulation at 29 CFR 1630. The second one was intended to lower their standard, right? Yes, Your Honor. And would the court then, if there's a jury in a case like this, have to instruct the jury in that regard? So what our regulation... They just have to use the second one. So it's supposed to use the current standard. And our regulation standard we say is this isn't supposed to be magic words. You can compare the way that the plaintiff and the case... Judge Gallagher, we're talking about the part of the opinion where she referred to the earlier standard rather than later standard too, right? I'm not sure, Your Honor. I follow the question. I apologize. You said Judge Gallagher applied the wrong standard. For the retaliation standard, she applied it in two standards. For the disability standard, I believe it was primarily in the one section. And so just to answer what I think the question is, is you compare it to the general population. So it's not a magic word standard. You say, how can they accomplish this major life activity or perform this major bodily function as compared to the general population? And Congress intended that to be a simple question to move the focus on to whether or not someone engaged in the act of discrimination rather than what it saw as a too stringent focus on whether or not someone had a disability before the age of AAA. If I may, I know you said you had questions on material... I did. Here's the question about materially adverse. And I understand you take issue with the use of the word significant in layered. And I guess what I'm just having a little trouble with, right, is Burlington, as I read it, gives us three synonyms effectively, right? And so they say, first, it has to be materially adverse, right? But that itself doesn't tell us a whole lot, right? So it goes on and says, well, what is that? That means dissuade a reasonable worker, right? OK, well, now we understand that. But then it comes back and it says we speak of material adversity, right? This is the first question, right? Because it separates significant from trivial. And so it seems like it's telling us three different things there, right? All of which it's treating as synonymous, right? Material adverse, right? Dissuade a reasonable worker and significant. Those are all three parts of the same whole, right? Three in one, if you would. Why is that wrong? Your Honor, I'm not sure that it's wrong. I just think they're different amplifications. So the standard is, is it materially adverse? And critically, it's set that out to distinguish from the pre-Burlington northern cases, including the Von Gunten case from this circuit, that equated the adverse action for discrimination claims and retaliation claims. I get that on the employment piece, right? But it doesn't seem to be doing it with respect to significant versus trivial, right? Like, that's the broad is, we've got to separate the significant from the trivial. How do we do that? It's got to be materially adverse. What does that mean, right? That means that it has to, you know, dissuade a reasonable worker, right? Why aren't all three part of its chain? I think what we get to is materially adverse is a standard. And then they give you the dissuade a reasonable worker standard, as this court recently recognized in Lorne Workman, that that's the operating standard. That that's a test the courts in this circuit and other circuits should apply to determine whether an act is sufficiently adverse for retaliation. Well, but what the Burlington northern does is that's the test we apply to determine whether it's significant or trivial, right? That that's, I mean, that's the language that they use to separate the significant from trivial harms. And I think one place where that may be causing concern is that I think the significant detriment test that this circuit applied, and that pulled from that pre-Burlington northern standard, still incorporates that pre-Burlington equating of the discriminant retaliation requiring the terms and conditions. So the word significant means not trivial in terms of Burlington northern. But significant detriment, as was used in the district court, and I'd look really primarily at the Adams decision where the court laid out the significant detriment and how that pulls from people into northern cases. And you see it in the district court here, where it laid out the significant detriment standard. Again, this is sort of the same problem that we've got with disability, right? Is that the words are one thing, but you're worried about pulling from other case law, right? It's not so much that severely or significantly is different or significant versus trivial, but you're worried about the pre-case law, not the words that are being used themselves. Well, I think the words carry the meanings that have been given previously. So with significantly or severely, Congress said that was too high. We need to lower the standard, and that's what our regulation currently does. Here, the Supreme Court in Burlington northern changed the standard for retaliation claims. They don't need an effect on the terms and conditions of employment. And unlike in Adams, where it looked for a significant detriment to see if the conditions of the workplace had changed, the Supreme Court says it has to dissuade a reasonable worker. It has to be a working that may well dissuade a reasonable worker. So the words are similar, but they really do carry different meanings. But it's all okay. I think I understand your position. Sorry about that, Judge King. That's okay. Thank you so much, and I appreciate the extra time. We appreciate your time and attention to these issues. Good to have you here. Thank you for your help. Ms. Crow. Good morning. Good to have you, Ms. Crow. Thank you. I may have pleased the court. I'm Heather Crow with the Coleman Firm, and I'm here today on behalf of Apelli Enterprise Services. It is our position that the orders of the district court should be affirmed. As you've seen throughout the briefing and the argument in this case, Mr. Israelite wants you to focus on his toe, but it's clear from evidence that was adduced at trial that his employer, HP, focused on his performance instead. I do want to go ahead and get to a couple of the questions that came up in the previous discussion, particularly with respect to the jury trial. First of all, there was some discussion about the Kramer case and what has been characterized as a line of cases that rise and fall. I think it's clear from those other cases, if you look at the Alvarado case, for example, it's clear that those cases engaged in their own statutory interpretation and analysis. And so while they came to the same conclusion, I don't know that they necessarily all rise and fall based on just one finding. And I think we have to assume that the courts have engaged in that sort of statutory interpretation in each of the holdings. As you mentioned, all of the appellate courts that have ruled on this have found that the statute addressing retaliation doesn't provide anything in terms of damages other than equitable damages. One thing I wanted to comment on, the Kramer case does not rely on statutory silence. That wasn't what the finding of that court was. Instead, the court relied on a plain language reading and explained that it was very clear that, and I don't want to go into a ton of this stuff that was already talked about, but as 2000E provides for equitable damages, back pay in that sense is a form of equitable damages. I don't mean to interrupt you, but maybe we want to start the clock. It started and it is counting down here, but it's not counting down on the monitor, so I've let IT know. No worries. Sure. Thank you. We'll be fine. Thank you. Sorry. No, no. Sorry. Thank you. 2000E provides very specific damages. It provides only for equitable remedies. What's important here is that when Congress, one year later, after the passage of the ADA Act, one year later, Congress passed the Civil Rights Act of 1991. That included 1981A. 1981A did set forth additional remedies only for specific causes of action, and it enumerated those. One of the things that was mentioned today was that one of the arguments that was made was that because retaliation was not excluded from that, and there were a couple of things that were excluded, that we should assume that retaliation could simply be read into that. That's wrong, and both context and statutory interpretation support that. First of all, there were two things that were excluded. One was disparate impact. Just for context, disparate impact was codified in the 1991 Civil Rights Act, so it kind of makes sense that it was not there, that it was excluded substantively as well. The title of 1981A is intentional discrimination. Disparate impact, by definition, is not intentional discrimination, so it makes sense that that was excluded. The other thing that was excluded were damages under 1981, and the notes, and I believe the memo of the sponsors in the legislative history show this, that the reason 1981 was excluded was to prevent duplication of damages between a Title VII plaintiff and a 1981 plaintiff. So it makes sense that those two things were excluded, and the fact that retaliation is not dispositive and is essentially of no moment  The other parties here have tried to indicate that retaliation is a form of discrimination, and therefore this sort of causal link has occurred. But the Supreme Court has been pretty clear, and this is some additional authority here, but the Supreme Court has been very clear that that's not the way that this particular statute should be analyzed. First of all, back in the National Railroad Passenger Court case back in 1974, the Supreme Court cautioned that when legislation provides a particular remedy, the court should not expand the coverage of that statute to subsume other remedies. After that, the court ruled in the Nassar case, and the Nassar case was pretty important. It addressed some of the things that the Alvarado case also argued, or also addressed, for example, the Gomez-Potter case. And what I mean is that those cases addressed whether or not retaliation could be read as a form of discrimination. And in the Nassar case, the Supreme Court said they can't under the Title VII context, and here's why. Those that had allowed that reading were the Jackson v. Birmingham case that's been cited, the Gomez-Perez case that's been cited. Those addressed Title IX. They addressed the federal aspect of ADEA. There were some cases that addressed 1981 and 82. The Nassar court separated those statutory schemes and said those were broad-based, broad language that didn't separately address retaliation and discrimination. And the Nassar court said that's different here because Title VII specifically provides for discrimination and retaliation separately. And where Congress has chosen to give us a very detailed statutory scheme, then we can't simply sweep them all together and assume Congress meant for them to be treated the same. And so under that analysis, which would control here as well, we can't simply assume that where both the ADA and Title VII are very specific, they can just be all swept together or be part of a causal chain where Congress didn't say that. Congress has the courts recently made a couple other rulings on that. One of them was the recent Badgerow case. And again, I don't believe the Badgerow case is in our brief, but it has some really good language in it. It was just ruled on this past year. The Badgerow case looked at the FAA. Under the Federal Arbitration Act, the court said, well, if you look at Section 4, which allows a party to file a petition to compel arbitration, there's language in that section that allows you to look through and establish subject matter jurisdiction. Conversely, if you look at the other two sections that we're talking about, which were 9 and 10, which are vacater and confirmation of an arbitration award, the court said that same language is noticeably absent. And where there are pieces in one statute that say one thing, but that's noticeably absent in the other, we have to assume that Congress meant for that to be the case, that Congress didn't mean for them to have the same meaning, that Congress did what it said or meant what it said. I would also like to briefly talk about the ADA claims. This court, of course, has the authority and can affirm on any grounds supported by the record. We would argue here that, first of all, despite any language that was used by the district court quoting the preamendment language, that even under the correct standard, that Mr. Israelite didn't meet the disability standard. But even if he did, he... You would admit error on that point and say it's harmless? Is that what you're saying? I would say that it's harmless for a couple of reasons. One is because... Did you argue harmlessness in your brief or is this a latecomer response to my question? I don't believe that we argued harmless error in this context. We argued that, maybe not in so many words, but it didn't matter because he couldn't meet the other elements of his claim anyway. Whether or not he's disabled is only the first step in the prima facie case in the McDonnell-Douglas analysis. He couldn't meet any of the other elements as well, which the court found that he couldn't show that he was meeting the job requirements.  Do we have a right to rule that he couldn't be disabled under any standard? Yes, we would argue that you definitely do. We would argue that you do under the correct standard. We do argue that in our brief. We cite a case out of the Tenth Circuit that's right on that point where the court said, even if the court cited or relied on the old standard, as long as he doesn't meet it under the correct standard, we can still affirm the holding of the district court. Is that because we're reviewing this de novo? Is that your basis for how we're able to ignore the error that you've conceded and look to other things with a blind eye to that error? That's correct. That's correct. This is a de novo standard. The factual findings of the court below, however… Isn't that our… I mean, don't we have a decision in Miller that does just that? It's unpublished as well, right? We've talked a little bit about unpublished cases today. Right. We do precisely that in Miller, right, where we say, I frankly can't tell the difference in these standards, right? Substantially limit or severely restrict seem to me to be the exact same. But regardless, the point being is that either one of those sets of words you want to pick, it wouldn't have made a difference here. We would absolutely agree. That's absolutely our position is that under the facts, and the finding of fact by the district court is a clear error standard. So applying the facts that were found by the district court to the law, he still couldn't meet the standard for having a limitation. But the law, clear error applies to facts. You're not talking about a factual. Correct. I'm only talking about facts that the court found in making the ruling, in applying the law. But they applied the wrong law. That's a legal error. Correct. That would be a legal error. And so there's a de novo review for the issue of whether or not he's disabled under the statute. Do you have a way to help me understand what the difference between substantially limit and severely restrict is? Well, the rest of the record. I mean, I understand the sort of history that, you know, they wanted to get rid of these old cases. But, you know, if I'm a judge and I'm looking at those two words, I happen to be a judge looking at those two words. But just hypothetically, if that was also true, like help me understand how I see those as being materially different. I mean, we slice things thin, but that seems awfully thin. Well, without going back into the history, as you said, you already understand that. So I think applying it here, the regulations, the new regulations state this, that we are looking at whether or not the impairment that the person has or alleges that they have substantially limits the ability of the individual to perform a major life activity as compared to the rest of the general population. And I think that language about the general population is probably the most illustrative of what we're looking for here. Here we have an individual who testified that he had, you know, an impairment in his toe and that it somehow affected his gait or his ambulation or whatever. But we also have testimony from him that he walks as his choice of exercise. He walks a couple of times a week. He walks up to 45 minutes at a time. And even if you take into consideration the occasional stop-start that he talked about, being able to walk for 45 minutes is not substantially limited when you look at the rest of the general population. The point of the general population is to not compare him to a pro athlete? What's the point of that? That's the idea? That's what you're getting at? We're looking at sort of the general population. We're not looking at the most fit or, you know, the speed walkers aren't the right comparison. Yes, I would absolutely agree with that. We're just looking at sort of an average Joe here. He also talked about, you know, having some pain in his toe when he drove. Does he walk with a cane? He did not. I can't speak to now. It's been several years. It's been almost ten years since the relevant time period. But during the relevant time period, he testified he had no assistive devices, that he didn't need a handicapped room, he hadn't had treatment in years. And while, of course, none of those things are dispositive by themselves, all together, they indicate that he didn't have any substantial limitation under any reading of the ADA. He talked about driving. He said he had some pain in his foot if he had to do stop-start driving. But he didn't give us that, you know, he didn't provide any evidence as to how that's substantially limited. And, in fact, he talked about one incident where he said he had some pain, some pain in his foot after he drove. Except that, he also told us in his testimony that he was in stop-start traffic for four hours. So if we're looking at somebody that can drive. What was he in for four hours? His car, driving. He was driving a car for four hours. He was driving a car for four hours in stop-start traffic. So, you know, if you're driving for four hours in stop-start traffic, I'd venture to say that the general population might be uncomfortable after that. So if that's the kind of comparison that we're looking for, you know, it's our position that he's not disabled under the ADAAA. And, again, even if he was, he still can't meet the other requirements that he has to prove discrimination under the McDonnell-Douglas burden-shifting analysis. As far as the Burlington standard that we talked about, that was talked about earlier today, it's our position that Burlington says it has to be a significant harm, not a trivial harm. The court used the phrase significant detrimental effects. It's our position that that is in complete conformance with what Burlington mandates, is that there has to be some sort of materially adverse harm. The Burlington court said that the anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. And the things that have been alleged in this case, aside from the termination, the Burlington issue here is not talking about the termination. Aside from the termination, he hasn't alleged anything that was a significant harm to him. Doesn't he allege, though, that it's the culmination of things that led up to, in essence, being set up to be terminated by not going to various events, not having access to certain things that culminated into being able to create this deadline that he couldn't meet? Isn't that his argument? That is his argument, and I'll say a couple of things on that. First of all, the two things that he really points to, which is his request for a hotel room, first of all, he didn't make that through his manager or through HR. He made that through the hotel. And his supervisor, Mr. Romas, was not the person who kept him from going to the conference. He didn't go to the conference because his registration was rejected after he and some other folks used a customer code. They were sort of bending the rules, and they used a customer code. HP Protect was a customer-facing activity. It was a customer-facing conference. It was not for employees.  They bent the rules. They used this code, and his got flagged when he called the hotel. Someone noticed it. The other thing that happened was he asked to be a driver on a rental car, but the reason that he didn't go to that was because Jess May, who was not his supervisor, she simply managed the budget, instructed him not to charge to her project anymore. And when that happened, he didn't have a need to go. Again, that wasn't Mr. Romas that did that, and there was never any evidence that Jess May was aware of the request at all. And as to your point, his sort of theory that he was set up, the evidence that was adduced in this case made very clear that Mr. Romas had been hired, and he testified to this extensively, he was hired to build a team. He was hired to build a team, an R&D team and a lab. All of the folks that were working there were working under a general engineering code. Occasionally they would go out to another project. They would always come back to engineering or overhead. He explained that it was an investment that HP was making in order to develop these products and these architectures. But it is completely illogical for us to believe that Mr. Romas hired this person at a very high salary to fill a need that he had on his team. And then because he asked for a hotel at a conference that he didn't have to go to and that didn't affect Mr. Romas or his budget in any way, he was going to pay for it himself, that that had any effect on Mr. Romas or that he bore some sort of animus against that or that because he asked to be a driver at a meeting that Mr. Romas was not in charge of and he didn't go to anyway, that those two benign requests would somehow create this animus that would cause Mr. Romas to engage in a months-long scheme to set him up for termination. That's simply illogical, and the court found that that was not what happened. The court found that he was discharged because he was a poor performer. And I'll also point out that the court relied on what it termed a, quote, mountain of evidence for that. Not only was there testimony, there was an extensive amount of documentation that supported her findings for that. I think I'm out of time. Very good. We would ask that the court affirm the findings of the lower court. Thank you. Thank you very much. We appreciate your help. Mr. Zaslow? Initially, I would like to address the, quote, unquote, facts this counsel just articulated are not the facts that they must be construed under the procedural posture we're here today. That was all those, quote, unquote, facts were effectively a closing argument. The facts as displayed in our brief are how the facts must be construed given the procedural posture of the case. We're here on an appeal of a dismissal on a case for summary judgment. The facts must be construed in light of the most favorable to us as a non-moving party. And under that standard, number one, he's severely limited in his ability to walk. He cannot – I don't know what his four hours of traffic is. He could not drive downtown traffic. For his exercise, his big exercise is walking for 30 minutes in a Costco, quote, when he can. That is his best exercise. But at times he can barely walk. These are the facts that must be construed in favor of Mr. Israelite. 30 minutes is pretty good. When he can in a flat store like a Costco. We've never said he's always wheelchair-bound. But under the case law, particularly under the ADAAA, episodic impairments are clearly disabilities under the ADA. And, in fact, the case – All the problems with the one toe. Everything emanated from the single toe problem. From his toe problem, that limits his ability to walk at times. It's very painful all the time. And everything else, as described in our papers. If we assume everything that you're saying is true, that then supports that he had a disability. Yes, Your Honor. How do we now get to somehow that disability was connected to the termination? That's what I'd like to hear you talk about. They say, well, he was not performing well. Where is the fact dispute with regard to not meeting a deadline and then being terminated? And we had a powerful dispute of fact on this. In fact, frankly, we had a trial. The trial was significantly divided on this issue. But ultimately, there is strong evidence in the record that Mr. Israelite was performing properly up until the time he made his accommodation request for HP Protect 2013. It was immediately after he made the request. That's when he was kicked off of all the daily meetings. That's when they stopped including him on the daily work. Once Mr. Israelite stopped complaining, he was quiet. In October and November of 2013, that's when everything was good. That's when he started getting praise for his performance and everything else. In December, he turns around. He makes a second request for an accommodation. And he's immediately met with swift retaliation. He's immediately met with not the interactive processes, of course, the court knows they must engage in. But he's met with an immediate response by Jeff May, who's a manager. She's a high-level manager who has control over what projects people are working on. She says, you are kicked off. You cannot build your only billable client. He was kicked off the one team-building trip, including with roadmaps as entitled in the briefing. Literally kicked off. The first day after they returned from the St. Augustine trip. Did she fire him? Mr. Romas fired him. Right. Not the woman you're talking about that said you can no longer build to this client code didn't fire him, right? It was Mr. Romas, but he was at the direction of Ms. May. So Mr. Romas removed him from all billable work at the direction of Ms. May. So Mr. Romas, Mr. Israelite goes to Mr. Romas requesting accommodation to St. Augustine. Mr. Romas goes to Ms. May. The response is, you're off. And we know Ms. May was actually included in all of the HP Protect issues. So they knew this was happening. Frankly, the way it came out at trial, the retaliation aspect of it was, here we go again, effectively. Here's Mr. Israelite bringing up his disability again. Here we go again. And it was immediately met with swift retaliation. In fact, the trial, Mr. Romas made it even worse. He actually tightened the timeline even further to basically make it as immediately after Mr. Israelite requested the accommodation for St. Augustine. He immediately was removed from the front of billable work, and he started the termination proceedings. That was what he admitted in the trial. Several weeks before he actually did it. So the way it came out at trial, and we put this in our papers, it came even worse. Immediately after the request for the accommodation, he was immediately discriminated against and removed from all of the billable work. For all the reasons discussed in our papers, the facts here were sharply in dispute. The project that was given to him was a massive, impossible product with a severely tightened deadline that clearly would dissuade a reasonable worker from engaging in protected activity. For all the reasons stated, the facts in our brief, as well as the legal arguments in our brief, as well as the EEOC, we request reversal and remand to the trial court. Unless the court has any additional questions, thank the court for its time. Thank you, Mr. Zaslow. We appreciate it very much. And we appreciate all the counsel's presentations and their written submissions. We will take the matter under advisement, and we will adjourn court for the day and come down and agree counsel. And all the best to everybody. The court stands adjourned until tomorrow morning. That's the United States and its Honorable Court.
judges: Robert B. King, Julius N. Richardson, Joseph Dawson III